Robinson et a.
*vs.*
Leavitt.

---

## A. TUCKER *vs.* N. AIKEN and others.

If an inhabitant of a town, on being called upon by the selectmen for an invoice, do not give in an account of his property, taxable by law, but says, in relation to a portion of it, that he is willing to be set down a certain sum —this is a neglect to give in his invoice, and the selectmen are authorized to doom him, in the taxes of that year, such sum as they may judge just and equitable. And they may do this by setting down in the invoice such property as they suppose he possesses, and assessing his proportion of the taxes upon the invoice so made up.

An individual who subscribes for shares in a bank, and pays part of the amount of the capital, and conveys his shares to the bank to secure the residue, is liable to be taxed for the amount thus paid in, as the owner of bank stock.

An article in the warrant for a town meeting, "To see what sum of money "the town will vote to raise for the support of schools, of the poor, repairing "bridges and highways, for the payment of the just debts of the town, and "for other legal purposes," states with sufficient precision the subject matter to be acted on under it.

It is not necessary that towns in their votes raising money for the annual expenditures authorized by law, should in all cases raise a specific sum for each particular object. A vote to raise a certain sum for the expenditures of the current year is a legal vote.

The general principle that the acts of an officer *de facto* are valid, so far as the public or the rights of third persons are concerned, and that the title of one

who comes into office by colour of an election or appointment cannot be enquired into in a proceeding to which he is not a party, is applicable to those officers of towns whose duty it is to assess and collect taxes.

Thus when the office of collector was set up at auction, in town meeting, and struck off to the lowest bidder, and the town afterwards chose the same person collector—although such proceeding is illegal, the collector coming into office by colour of an election, is to be considered an officer *de facto*, and the objection cannot be taken in an action against the selectmen.

So where the moderator of a town meeting at which the collector was chosen neglected to take the oath required by the statute—*held*, that the selectmen were not liable for committing the taxes to a person chosen at such meeting as collector.

CASE. The first count alleged, in substance, that on the 30th April, 1831, the defendants, being selectmen of the town of Derry, called upon the plaintiff, an inhabitant of that town, for an invoice of his taxable property ; that the plaintiff gave them an invoice of his taxable property, including among other things $2000 in bank stock ; that the defendants accepted the invoice, and did not require the plaintiff to make oath to the truth of it ; that on the first of April in that year the plaintiff had no more than $2000 in bank stock ; that the defendants, afterwards, without the knowledge of the plaintiff, altered the said sum of $2000 in the plaintiff's said invoice to $7000, and assessed him accordingly in all the taxes of that year, so that the sum of $93 71 was assessed upon him, being $70 more than his just proportion ; that the defendants committed the taxes so assessed to one Josiah Stowell, with a warrant directing him to collect the same ; and that Stowell by virtue of the said warrant seized certain oxen, &c. of the plaintiff as a distress for said taxes, and sold the same.

There was also a count in trover for the cattle.

The cause was tried, upon the general issue, at the August term of the Common Pleas, 1833, when it appeared in evidence, that the defendants were selectmen of Derry in the year 1831 ; that they called upon the plaintiff, in the month of April that year, for an invoice of his taxable property, and among other things for an account of his

bank stock and money at interest ; that he gave an account of his cattle and other property, but as to bank stock and money replied that he was taxed high enough the year before in that respect ; but if it would be of any advantage in taxing others correctly, he was willing that his invoice should be raised five dollars ; to this the selectmen assented, but afterwards, on learning the further facts stated in this case respecting the plaintiff's bank stock, they inserted $7000 bank stock in his invoice, and assessed the taxes upon that invoice. In the plaintiff's invoice for 1830 there was the sum of $2000 bank stock.

It further appeared that the plaintiff was an original subscriber for one hundred and forty shares in the Derry bank, at $100 each ; that he paid to the bank $7000 in part for the shares on the 7th September, 1829, and on the same day gave to the bank his note for $7000, which was passed to the credit of the bank as a part of the capital stock. On the same 7th September, 1829, he assigned all his interest in the said shares to the bank, as security for the payment of said note, and in case the said note was not paid, agreeably to the order of the directors, the said shares were to be sold, and the proceeds applied to the payment of any claim the bank might have against him, and the surplus passed to the credit of the plaintiff. In this state the shares remained on the 1st April, 1831.

The plaintiff was holden as surety on the 1st April, 1831, upon several notes to the bank, amounting in the whole to $2465, and on the same day was the owner of eight shares in the capital stock, in addition to the one hundred and forty shares above mentioned.

The defendants were duly authorized to assess upon the town the sum of $339 37 for a State tax, and the sum of $172 90 for a county tax.

There was in the warrant for holding the annual meeting in March, 1831, an article as follows :

" To see what sum of money the town will vote to raise

A. Tucker
*vs.*
N. Aiken et als.

" for the support of schools, of the poor, repairing bridges " and highways, for the payment of the just debts of the " town, and for other legal purposes."

On this article the town passed the following vote :

" *Voted,* To raise the sum of two thousand dollars for the " expenditures of the current year, being the subject matter " of the eighth article in the warrant, excepting for high- " ways and bridges."

The following is a copy of the records of the same meeting in relation to the choice of collector of taxes :

" Proceeded to vendue the collection of taxes for the " present year, and Samuel Adams bid off the collection of " the same at one cent on the dollar, and he was thereupon " chosen collector of the taxes for the town of Derry the " current year."

It appeared that Adams bid off the collection of the taxes for one Josiah Stowell, and requested the town to choose Stowell collector, but the town refused to choose Stowell, and chose Adams.

In the warrant for holding another meeting of the town, on the 13th August, 1831, the second article was :

" To sell the collection of the town, county, state and school taxes for the present year."

And the record of the doings of the town upon this article was as follows :

" Samuel Adams, Esq., the person named as chosen col- " lector at the annual meeting, appeared and did not accept " of his appointment, and thereupon Josiah Stowell, having " bid off the collection of the taxes the current year for one " cent on the dollar, was chosen as collector for the current " year."

The moderator of the last mentioned meeting was not sworn.

The defendants committed the taxes by them assessed to Stowell, as collector, with a warrant in common form for their collection ; and Stowell, by virtue of the warrant, on

the 25th January, 1832, took the property mentioned in the declaration as a distress, and sold it to pay said taxes.

The taxes assessed upon the plaintiff were—town tax $59 24, county tax 4 94, state tax 9 88, school tax 19 65 : total, $93 71.

A verdict was taken for the plaintiff, by consent, subject to the opinion of the court upon the foregoing case.

*Betton, Porter,* and *Bartlett,* for the plaintiff, contended,

1. That the plaintiff was not, under the circumstances, liable to doomage under the first section of the statute of July 7, 1827, because the defendants did not require him to give in an inventory of his taxable property under oath. *N. H. Laws* 553 ; 5 *Mass. R.* 547, *Dillingham* vs. *Snow.*

Having set down the sum of $2000 in the invoice, the selectmen had no authority to make a different invoice until they had called upon the plaintiff to give in an invoice on oath. Nor had they any right to assess a fourfold tax as for a fraud.

2. The bank stock was transferred to the bank, and the plaintiff was not liable to be taxed for it. It was conveyed in mortgage. The title and right of property passed to the bank. 2 *Pick.* 206, *Parks* vs. *Hall; ditto* 249, *Gordon* vs. *The Mass. F. & M. Insurance Co.* ; 3 *Pick.* 495, *Peters* vs. *Ballistier;* 16 *Mass. R.* 275, *The N. E. M. I. Co.* vs. *Chandler ;* 5 *Green.* 96, *Reed* vs. *Jewett;* 2 *Pick.* 607, *Homes* vs. *Crane;* 7 *Cowen* 290, *Ackley* vs. *Finch;* 8 *Johns.* 96, *Brown* vs. *Bennett.*

It should have been taxed to the corporation, and it does not appear that it was so taxed.

It was out of the plaintiff's possession, and out of his control so long as debts remained unpaid, and of course it was not taxable to him.

3. The vote of the town of Derry to raise money was illegal and void. The article upon which it was founded

was insufficient. The term "legal purposes" is indefinite. It does not appear what purposes were intended.

The vote itself is bad, in raising a gross sum for different objects. It should have designated the sum to be appropriated to each object. 3 *N. H. R.* 292, *Gove* vs. *Lovering*.

The vote is also void for uncertainty. It does not appear whether the sum of $2000 was intended to include the amount the selectmen are by law bound to assess for the support of schools, or to be in addition to that amount.

4. The sale of the office of collector rendered the election void, and Stowell had no authority to make the distress. 6 *N. H. R.* 190, *Cardigan* vs. *Page ;* 5 *ditto* 196, *Carleton* vs. *Whittier ;* 2 *ditto* 517, *Meredith* vs. *Ladd ;* 4 *Barn. & Cres.* 319, *Waldo* vs. *Martin ;* 2 *Car. & Payne* 1 ; 8 *D. & E.* 89, *Blatchford* vs. *Preston ;* *Bac. Abr. Officer F*.

Acts of public officers, who are *de facto* such, may in some instances be valid, but this is only from principles of public policy, and does not apply to officers of a private corporation, nor to town officers. The necessity does not exist.

5. The proceedings of the town, at the meeting in August, 1831, when Stowell was chosen collector, were void, the moderator not being sworn. The statute of July 2, 1831, sect. 2, enacts that the moderator of any annual or other town meeting, in any town or place, shall be sworn to the faithful and impartial discharge of the duties of said office. 3 *Barn. and Ald.* 260, *The King* vs. *Ferrand ;* 2 *N. H. Rep.* 206 ; *Com. Digest, Officer K.* 7. This is not directory. It is essential to the legality of the meeting.

*Gregg*, *Cutts*, and *Sullivan*, for the defendants.

1. In order to give the defendants a right to doom the plaintiff, it was not necessary that they should have required him to be sworn, and to give in an invoice under oath. He gave no account of his bank stock. He only said he was taxed high enough the year before. This amounted to

nothing. If he had actually given in an invoice perhaps he could not have been doomed without requiring him to make oath to it, but he gave none.

2. These shares were conveyed in pledge, and the general property did not pass. 2 *Caines' Cases in Error* 200, *Cortelyou* vs. *Lansing*. But it is wholly immaterial whether they are considered to have been mortgaged or pledged. In either case the plaintiff was to be considered as the owner of the shares, to the extent, at least, of one half of the amount, and was liable to be taxed accordingly. The case is not altered by the circumstance that the shares were further held as security of the plaintiff's liability to the bank as a surety. He must be presumed to have had an indemnity for such liability, and was, notwithstanding the shares were so held, justly liable to be taxed for the amount which had been paid upon them. He then had an interest in the bank stock to the extent of $7,800 for which he ought to have been taxed.

But whether the defendants set down too much or too little, by way of doomage, is immaterial. The statute has made them judges of what is reasonable, and their judgment, when fairly exercised, is conclusive.

3. It has never been the custom in this State, in raising money at the annual meetings to defray town charges, to designate a particular sum for each particular class of expenditures. The practice, it is believed, has been uniform to vote a gross sum; and great inconvenience and mischief must result from holding that such votes are illegal and void.

There is no uncertainty in the vote. The money voted to be raised for schools must be intended to be in addition to the amount the selectmen are bound to assess. With the raising of that amount the town has nothing to do.

4. When a person comes into office by colour of an election he is an officer *de facto*—and, although he may not be such *de jure*, his acts are valid when they concern the public, or the rights of third persons who have an interest

*A. Tucker vs. N. Aiken et als.*

in them.   7 *Johns.* 554, *The People* vs. *Collins ;* 9 *Mass.* 231, *Fowler* vs. *Bebee ;* 15 *ditto* 180, *Bucknam* vs. *Ruggles.*

Stowell was elected collector by the town.   He came into office by colour of an election ; was a collector *de facto ;* and whether he was such *de jure* was no concern of these defendants.   With respect to them he must be considered a collector to whom they might lawfully commit the taxes.   The statute is imperative that the list shall be delivered to the person chosen collector.   *N. H. Laws* 557. The selectmen had no right to decide whether he was legally elected or not.

5.  The validity of the doings of the town, at the meeting in August, is not at all affected by the circumstance that the moderator was not sworn.   15 *Mass.* 180, *Bucknam* vs. *Ruggles ;* 3 *Cruise's Digest, Title Officer, sections* 71—75 ; 3 *N. H. R.* 408, *Moore* vs. *Graves ;* 7 *Johns.* 549, *The People* vs. *Collins ; Hawk. P. C. book I. chap.* 8, *sect.* 3 ; 2 *Gallison* 12, *United States* vs. *Batchelder ;* 1 *N. H. R.* 266.

PARKER, J.   The statute of July 7, 1827, provides " that " the inhabitants of the several towns in this State shall " annually exhibit to the selectmen a just and true account " of their polls and estates rateable by law.   And the select- " men shall give warning at some  public  meeting, or post " up advertisements at some public place or places in their " town, or in some other way give notice to the inhabitants " of the time and place in the town when and where they " will meet to receive such account ; or the selectmen may " make personal application to the respective inhabitants of " the town for an account of their polls and rateable estate, " or in any manner that the town at a legal meeting may " direct."

It then enacts, that " if any person shall neglect, after " being duly notified, or shall refuse when called upon in

" person by any of the selectmen, to give a true account of " his poll and rateable estate, on oath if required," " the " selectmen may set down to such person or persons as " much by way of doomage as they shall judge equitable, " and make the assessment accordingly."

And it is further enacted, " that if any person in giving " an account to the selectmen of his estate rateable by law, " shall not give in the whole of his estate so rateable, but " shall conceal some part thereof from the knowledge of " such selectmen, they may for any estate so concealed and " not given in, upon discovery of the fraud, rate such person " in all taxes of that year, four times as much as such estate, " if given in by the owner, would by law have been rated " or taxed."

The course to be pursued under these provisions of the statute, is very clear. The selectmen are in some way to give notice to the inhabitants of the time and place when and where they will meet to receive an account of their polls and rateable estates, or to make personal application to them for such account.

If any person upon such notice or application neglects or refuses to give in an account of his rateable estate, or, having given in one, does not if required make oath to the truth of it, the selectmen may set down to such person, by way of doomage, as much as they shall judge equitable ; and they may do this by entering in the invoice such property as they believe such person possesses, or such amount as they believe he ought to be taxed for, designating it as doomage, and proceed to make the assessment upon it in the same manner as if it had been given in by the individual as the account of the taxable property owned by him. Having given in no account of his property, or, which is the same thing, having refused or neglected to make oath to the truth of the account given, being required so to do, the selectmen are authorized to make up an invoice for him, such as they

believe to be just, and to tax him upon the invoice so made up.

If the individual gives in an account of his property, and no oath is required, or if, being required, he makes oath to its truth, the selectmen are not in such case authorized to set any thing down by way of doomage, but must tax him according to the account he has given, unless they discover that he has not given in the whole of his taxable property.

If after he has given in an account they ascertain that he has not given in a true one, but has fraudulently concealed some part of his property, they are authorized, upon the discovery of such fraudulent concealment, to rate him upon such property four times as much as the estate so concealed if given in would have been taxed; and this they may do by setting down the estate given in by him, and then inserting the estate concealed, designating it as such, and entering it at four times its ordinary taxable value. Perhaps there may be other modes in which such fourfold tax may be assessed, but this is immaterial at the present time.

In this case the selectmen did not assess the plaintiff upon that clause of the statute. Nor did they assess him according to an invoice given in by him; but believing him to possess property for which he ought to be taxed, they entered that property in the invoice, with other property which he had stated, and assessed the tax upon the invoice so made up.

This was in effect dooming him. It was setting down to him such sum, or property, as they judged equitable; and their right so to do this depends upon the question, whether the plaintiff, when applied to, did in fact give in an account of his estate rateable by law. If he did, as there was no neglect to make oath, none having been required, the act of the selectmen in dooming him, in a case where such authority did not exist, would be illegal, and the plaintiff entitled to recover.

Upon this question there can be no doubt. The plaintiff

did not give in an account of his estate.  He was applied
to by the selectmen, and it became his duty to give in a full and true account : such an account that an oath could be taken of its truth.  He proceeded to give in an account of a portion of his property, but when he came to his bank stock and money, instead of stating what he had—instead of proceeding and completing the account—he said he was taxed high enough the year before, but if it would be of any advantage in taxing others correctly, he was willing his invoice should be raised five dollars.

It is apparent that this was not giving an account of his bank stock and money.  Had he been required to make oath, and been sworn to the truth of the account thus given in, he would have testified, in effect, relative to his bank stock and money, that he was taxed high enough, in his opinion, last year, but was willing his invoice should be raised five dollars, if it would be of any advantage in taxing others ; and not that he had any particular amount of bank stock or money.  Had he been sworn in the first instance to give in a true account of his rateable estate—and he might have been required to make oath in that mode—such a statement as he made would not have been a compliance with the obligation imposed by the oath.

There does not appear to have been that fraudulent concealment which the statute contemplated when it authorizes the assessment of a fourfold tax.  That is to be done where the individual gives in what purports to be a complete account, such an account as may be sworn to, but conceals a portion of his property.  This is a case of palpable neglect or refusal to give an account, because the plaintiff did not complete it.

And it can make no difference that the selectmen did not object, or require him to take an oath.  They had made due application to him.  It became his duty to give an account. If he did not do this they were not bound to urge him or threaten him.  Their right to doom for want of an account

became complete when he evaded giving one ; and if they thought it equitable, from information acquired afterwards, that he should be assessed for any particular amount of bank stock, they were justified in making the entry accordingly. Had the plaintiff actually given in an invoice, a very different case might have been presented.

It thus becomes immaterial whether the plaintiff had or had not the amount of bank stock for which he was taxed. If, in the exercise of the discretionary power which the statute gave them, the selectmen had assessed him for much more than he actually possessed, there is no evidence that the assessment was made from any malicious or improper motive—and the plaintiff could have no reason to complain.

But I am of opinion that the plaintiff was liable to be taxed for his interest, to the amount of $7000, in the bank shares which he had conveyed to the bank to secure the payment of the residue of the capital stock. He was in fact, notwithstanding this, the owner of bank stock to that amount. It must have been so understood by him and by the corporation. The transaction was in the nature of a pledge, with a power to sell on a certain contingency, and to appropriate sufficient from the avails to pay what might be due to the bank.

Whether regarded as a pledge, or a mortgage, the property had not become absolute in the bank on the first of April, 1831, and the payment of the other half of the stock would have relieved it from the incumbrance. The plaintiff had then, at that time, an interest in those shares, as an owner, to the amount of the sum he had paid upon them. 2 *Pick.* 249, *Gordon* vs. *Mass. F. & M. Ins. Co. ;* 16 *Mass.* 275, *N. E. Ins. Co.* vs. *Chandler.*

The form of the paper issued to him can make no difference with the case. That was merely evidence of his ownership, and the terms of it. If the plaintiff had paid in to the amount of one half of the stock, and taken no certificate whatever, and by the rules of the corporation was to

receive none until he paid the residue, he would not have been the less an owner.

Upon any other principle, if the other subscribers had, like the plaintiff, paid in but half the amount upon their stock, and taken similar certificates, the bank itself—the incorporate existence—would have been the owner of all the stock; and we should have presented to us the anomaly of a bank without any stockholders—a corporation without a corporator.

Nor is the circumstance that the plaintiff was at the time a surety upon certain notes, and the bank, in case his stock had been sold, might have applied a part of the proceeds to the payment of those notes, of any importance.

The only error in this part of the case was that the selectmen did not doom the plaintiff enough, as he had an interest to the amount of $800 in other shares, for which he was not taxed.

Several exceptions have been taken to the vote of the town for raising money.

It has been contended that the vote is illegal because the article upon which it is predicated is insufficient—the term *legal purposes* being, it is alleged, indefinite.

The statute of June 28, 1827, requires the selectmen to insert in the warrant for a town meeting, the intent and design of such meeting, and the subject matter of all business matters and things to be considered and done at said meeting, and provides that " nothing done at said meeting, hold-" en by virtue of said warrant, shall be considered as good " and valid in law unless the subject matter thereof shall " have been inserted as aforesaid." *N. H. Laws*, 451.

This is all the requisition of the statute. It is no where enacted how specific the articles of the warrant shall be, farther than this : they must contain the intent and design of the meeting, and the subject matter of all business to be considered and done. If the article under consideration gives information of the subject matter to be acted on there

was a compliance with the provisions of the statute; and we think there can be no doubt of this.

The same statute provides that towns "may grant and " vote such sums of money as they shall judge necessary " for the support of schools, school-houses, the maintenance " of the poor, for laying out and repairing highways, for " building and repairing bridges, and for all the necessary " charges arising within the town."

The article in question sets forth that the town was called together to act, among other things, upon the subject of raising money for the support of schools, of the poor, repairing bridges and highways, the payment of the just debts of the town, and other legal purposes—that is, other purposes for which towns may lawfully raise money ; or in other words, according to the language of the statute, for the necessary charges arising within the town. This gave the inhabitants full knowledge of the subject matter upon which they were called to act ; and if the article had been in terms, 'for the payment of town charges,' or with still greater particularity, 'for the payment of the town officers, and all other necessary expenses for which the town may be liable,' the inhabitants would have had no more precise and definite information of the subject matter than they had by the article as penned.

It is farther said that the vote is illegal because it provides for raising a sum in gross for the current expenditures of the town, without designating each particular object.

Towns probably often do, in their votes, specify particular sums for some of the principal objects of expenditure, such as schools, highways, support of the poor, and town charges. This is a convenient mode of ascertaining the whole amount necessary to be raised, as estimates are usually made of the amount which each of such objects is likely to require.

But, excepting the money raised for schools and highways, it is not known that it has ever been the practice to require

that the sums so designated should be kept separate and distinct, so that, in case of a deficiency in the amount raised for one, and an excess in that voted for another, the constituted agents could not apply the whole of the funds raised to the whole necessary expenditure; and we are not able to discover any good which would result from requiring towns to make such appropriations specific, and keep them distinct. No reason for it has been suggested in the argument. To power of towns to raise money is very limited, and the danger of abuse very small. The amount which it may become necessary to expend for the support of the poor, and for defraying other ordinary charges, depends upon contingencies; and we are not aware that these sums are ever assessed separately, even if specific sums are voted. It is believed they are usually assessed under the denomination of "town tax," in a single column.

In relation to the money raised for schools, that is usually assessed by itself, and the appropriation kept distinct from other assessments—the law requiring a certain sum to be appropriated for that purpose, and giving towns power to raise a further sum; and it is doubtful if there is any legal mode of ascertaining the sum proper to be expended for that purpose, except by the requisition of the statute, or the vote of the town.

For the repair of highways also there should be a separate vote, and a distinct amount, (*N. H. Laws*, 578,) to be paid in labor—unless the town makes a different order.

Another exception which has been taken upon this part of the case, is, that it does not appear by the vote whether the sum thus raised was intended to be inclusive or exclusive of the sum which the selectmen were by law bound to assess for the support of schools.

By the statute of July 6, 1827, the selectmen "are em- "powered and required to assess annually the inhabitants "of their respective towns, in a sum to be computed at the "rate of ninety dollars for every one dollar of their propor-

"tion for public taxes for the time being, and so for a greater or less sum ; which sums, when collected, shall be appropriated to the sole purpose of keeping an English school or schools within the towns," &c.   *N. H. Laws*, 427.

The selectmen are bound to make this assessment if a town should not vote to raise any money for the support of schools ; but towns may, if they think proper, vote to raise a larger sum than the selectmen are thus bound to assess ; and with a commendable zeal in the cause of education this is often done.

The vote in this case admits of the construction that the portion of the article relating to raising money for schools was not acted on—that, by "the expenditures of the current year", the town intended what are often denominated "town charges", or the subject matter of what is usually called the "town tax" ; and it is very probable that this was the understanding of the town on the passage of the vote.

But whether the town intended that construction, and did not in fact act upon that part of the article relating to schools, or whether it was contemplated that a portion of the $2000 raised by the vote should be appropriated for schools, in addition to the sum the selectmen were bound by law to assess, there seems to be no valid objection to the legality of the vote.   There would be no illegality in omitting to act upon a part of the article, and acting upon the residue ; and if it was intended that a part of the $2000 should eventually be appropriated for schools, and if it should be held that the selectmen could not properly apply any part of it to that object without a farther vote, because they are not made the judges how much ought to be expended for education, still it was competent for the town by a subsequent vote to designate and appropriate such portion of it as might be deemed advisable to that purpose, in addition to the sum the selectmen were bound to assess ; and if no such appropriation was afterwards made, the whole might lawfully be applied to the general expenditures of the town.

The money would be applied to the use of the town for lawful purposes, and no injustice would be done.

If a portion was afterwards directed to be applied to the support of schools, and apportioned among the several districts according to the statute, it would come to the same result as if the amount had been designated in the first instance ; although it is doubtless the better mode to raise specific sums for this object, in the usual manner.

Whether, therefore, the intention was that any of the money thus raised should be appropriated in support of schools or not, the plaintiff has no cause of complaint. If the selectmen assessed the amount required by law to be appropriated to schools, in addition to the $2000 voted to be raised, they were justified in so doing, because the law was imperative on them to assess to that extent ; and the vote not having in terms appropriated any particular sum for schools, any portion of it intended for that purpose must be taken to be in addition to the sum the selectmen were required to assess. If they assessed only the $2000 the plaintiff cannot object, in this action, that he has been required to pay less than he might have been lawfully assessed.

It is farther objected, that Stowell, who acted as collector, had no authority to collect the tax, because the moderator of the meeting at which he was elected was not sworn, and because the office of collector was set up at auction, and the lowest bidder elected ; and we have given to this objection a very attentive consideration.

Of the impropriety of putting up any office at auction I can entertain no doubt. The circumstances of this case plainly show this, as the town insisted that Adams, who bid off the collection in the first instance, should serve, and refused to elect Stowell ; but when Adams persisted in declining, and Stowell himself became the lowest bidder, he was elected. The inference is irresistible, that the town

did not deem Stowell so suitable a person as Adams, but elected him finally, because he would officiate for a smaller compensation than any one else.

The direct tendency of such a practice is to introduce unsuitable persons into public employment—to induce the electors to give their suffrages to him who will work cheapest, instead of him who is best qualified. And if an office which is supposed to be onerous, and to deserve compensation, may be offered to him who is disposed to serve for the lowest wages, it is not apparent why those to which some honor is attached may not be offered to him who is willing to give most for the privilege of executing them. The formality of an election may be had afterwards, in the one case as well as in the other.

In fact, the office of collector has, in one instance at least, been deemed such an object of competition as to produce an offer of a nominal, even if it was not an actual, consideration duly paid. In a case recently tried in another county, the following was among the records produced : " Voted, " that the collectorship should be set up to the best bidder. " J—— M—— M—— agreed to give one and a half mugs " of toddy for the privilege of collecting."

No evidence of the impropriety of setting up the office at auction more conclusive than this would be desired or furnished : and there is no necessity for such a practice. The town may fix upon a suitable compensation in the first instance ; or it may be left for such compensation to be made afterwards, as the services rendered shall appear to demand, which is the usual course in relation to other town officers ; and in either case there is no inducement to elect an unsuitable person. Under the existing laws, if a town neglect to choose a collector, the selectmen may make an appointment, and allow the person appointed " a reasonable sum for his trouble."

I am clearly of opinion, therefore, not only that putting the office at auction is improper, but that an election, under

such circumstances, when properly drawn in question, must be held to be illegal.

The defendants, however, contend that Stowell in this case came into office under colour of an election, and was therefore an officer *de facto* ; that, as such, they were bound to commit to him the list of taxes assessed ; and that they were not authorized to judge of the legality of the election, and cannot be made answerable on this account, even if the election, in a proper proceeding against Stowell, might have been avoided.

The general principle undoubtedly is, that the acts of an officer *de facto* are valid, so far as the public or the rights of third persons are concerned ; and that the title of such an officer cannot be enquired into in any proceeding to which he is not a party. *7 Johns. R.* 549, *The People* vs. *Collins* ; *9 Johns.* 135, *McInstry* vs. *Tanner* ; *3 N. H. Rep.* 408, *Moore* vs. *Graves* ; *5 N. H. Rep.* 222, *Morse* vs. *Calley* ; *1 N. H. Rep.* 266, *Jones* vs. *Gibson* ; *9 Mass. R.* 231, *Fowler* vs. *Bebee* ; *15 Mass. R.* 170, *Nason* vs. *Dillingham* ; *ditto* 180, *Bucknam* vs. *Ruggles* ; *1 Salk.* 96, *Parker* vs. *Kett* ; *Com. Dig. Franchise F.* 29 ; *Hawk. P. C., b.* 1, *c.* 8, *sect.* 1, 3.

But proceedings founded upon an assessment and collection of taxes have been supposed to form an exception to this rule ; or rather a different rule has been supposed to be applicable to such proceedings.

The principle is expressly laid down, that in order to maintain a title to lands sold for taxes, or to justify a distress, " every substantial requisition of the law must be shown to have been complied with." *4 Peters' S. C. R.* 359, *Ronkendorff* vs. *Taylor's lessee.*

And it seems to have been understood that this principle included and required proof of the due election and qualification of all the officers concerned in the assessment and collection of the tax. *15 Mass.* 181 ; *ditto* 177 ; *10 Mass.* 113, *Colman* vs. *Anderson* ; *11 Mass.* 480, *Welles* vs. *Bat-*

A. Tucker
     vs.
N. Aiken et als.
*telle* ; 14 *Mass.* 145, *Pejepscut Proprietors* vs. *Ransom* ; 2 *Green.* 218, *Hale* vs. *Cushing.*

In *Proprietors of Cardigan* vs. *Page,* 6 *N. H. Rep.* 182, it was argued by counsel, and the position sustained by the court, that the setting up of the office of collector at auction was improper, and that an election under such circumstances was contrary to sound policy, and illegal ; and the rule indicated in the authorities last cited was supposed to furnish the correct principle. The circumstance that the collector was not a party to the case was not there adverted to or considered,

There seems to be no sound distinction between the acts of a collector *de facto*, in making a distress, or sale of property in order to satisfy a tax, and those of a sheriff in the seizure of property upon attachment, or in the way of an execution.

The selectmen, who commit the list of taxes to the collector, may have, it is true, more knowledge of the circumstances under which he was chosen and came into office than individuals ordinarily have respecting the particular circumstances attending the appointment of a sheriff or his deputy ; but still it may impose quite as great a hardship to require them to judge at their peril of the legal validity of those proceedings, and make them answerable personally for irregularities which did not originate with them—which they could not control—and respecting the legality of which they have but inadequate means of forming an opinion.

If the town proceeds to elect, their duty requires them to commit the list of taxes to the collector chosen, if the election be legal—and they have not the power to try the legality of the election—and to enter a judgment of *ouster.* If they are required to judge of the validity of the proceedings, they must do so without trial, and at their own peril if they mistake.

If there has been no election—no pretence of a due appointment—and they commit the list of taxes to a mere

usurper, there may be a good foundation for holding that this is such an unauthorized act as should make them liable for all after acts done under colour of the command which they had given.  7 *Cowen* 269, *Reynolds* vs. *Orvis.*

But when they commit their warrant to one whose election is on the record, and who claims the right to execute the duties of the office, there seems to be no greater reason why they should be held responsible on account of any irregularity in that election, than there is that a plaintiff should suffer who has committed his writ to one who is *de facto,* but not *de jure,* a sheriff.   It seems sufficient to hold them liable to show the validity of their own election, and the legality of their own acts ; and upon consideration of all these circumstances I am of opinion that there exists no sound principle for the application of a different rule in relation to officers who assess and collect taxes, from that applied to other officers who have duties to perform analogous in their nature.

If in such cases irregularity or illegality is supposed to have occurred in the election of any town officer, the validity of his election may be enquired into on a proper proceeding to remove him from office.   2 *Strange* 1090, *Rex* vs. *Lisle ;* 9 *Mass.* 235, *Fowler* vs. *Bebee ;* 10 *Mass.* 290, *Commonwealth* vs. *Fowler.*   And if this may be supposed to furnish inadequate relief, because the term of office is of such short duration as to expire before such process could probably be brought to a conclusion, a suit against him for any act, affecting the person or property of another, will compel him to show himself legally entitled to act, or he must be held answerable for such acts, done under colour of an office to which he had not a valid title.   2 *N. H. Rep.* 202, *Johnston* vs. *Wilson ;* 3 *N. H. Rep.* 515, *Bishop* vs. *Cone ;* 1 *Pick.* 111, *Thayer* vs. *Stearns ;* 3 *Green.* 298, *Massey* vs. *White.*   What would be the proper measure of damages in such case is not now a subject of enquiry.   If sufficient provision is not already made, by law, to ensure

A. Tucker
*vs.*
N. Aiken et als.

satisfaction of any judgment which may be obtained against any such officer, the legislature is the proper body, and has full power to provide a further remedy.

I am, therefore, of opinion that the moderator and collector were officers *de facto*, having come into their offices by colour of an election, and that this action cannot be sustained against the selectmen, on account of the neglect of the moderator to take the oath of office, or on account of the illegal proceedings of the town in setting up the office of collector at auction, and their electing him who was most desirous of attempting to discharge its duties. And no injustice can accrue to the plaintiff from this conclusion, as it does not appear that he has in fact suffered by reason of these irregularities.

RICHARDSON, C. J. I am of opinion that the verdict in this case cannot be sustained; but I shall confine my remarks to the two last points, having nothing to add to what my brother Parker has said on the other points.

It is contended that Stowell's appointment as collector must be treated in this case as altogether null and void. 1. Because the office was set up at auction, and he appointed merely because he was the lowest bidder; and 2d, because he was chosen at a meeting the moderator of which was not sworn.

In order to settle the questions which these points in the case present, it is necessary to consider who is to be considered as an officer *de facto*, and who a mere usurper, and when and how the authority of an officer *de facto* can be called in question.

In order to constitute an officer *de facto*, there must be some colour of right—some pretence or claim of title by an election or appointment.

He who assumes to execute the duties of an office without any colour of title is a mere usurper; and the acts of a mere usurper are void in all respects.

But the acts of an officer *de facto* are valid when they concern the public or the rights of third persons, who have an interest in the acts done.

And in general the validity of the acts of an officer *de facto* cannot be called in question indirectly in a suit to which he is not a party.

There are many cases in the books where these principles have been explained and applied.

In the case of the *Abbot of Fountain in the Year Books*, 9 *H.* 6, *folio* 33, one who was in the office of abbot of a religious house under colour of an election, when he in truth had only a minor part of the votes, made an obligation as abbot for goods sold for the use of the house—it was held that this obligation was not voidable by the true abbot who was elected by a major part of the votes, when he recovered the office, because he who made the obligation had colour of title, having had some votes, and those who sold goods to the house were not bound to examine his title to the office.

In *Knowles* vs. *Luce*, *Moor* 112, it was said there was a distinction between copyholds granted by a steward who had colour but no right to hold a court, and copyholds granted by one who had neither colour nor right; and that a grant by a steward who had only colour of right to hold a court was valid, because the tenants were not bound to examine his authority, nor was he bound to give them an account of it. *Comyn's Digest, Copyhold c 5*.

The case of *Leach* vs. *Howel, Cro. Eliz.* 533, was an information for bringing certain goods into the country by way of merchandise, " the custom and subsidy for them " due and not being paid nor agreed for with the customer " of London, nor in any other port, nor with their deputy." It was found in a special verdict that the goods were brought into the country, and an agreement made at the custom-house in Penryn with Richard Enys, who had exercised there the office of deputy of J. Basset, who was a deputy of

T. Peyton, the customer there, to answer to the queen all customs and duties. It was objected, that the agreement was not valid because made with a deputy of a deputy. To this it was answered, that Enys was deputy *in facto*, and although he were not deputy *de jure*, that shall not prejudice the merchants, for it would be mischievous to them to examine by what authority the officers of the customs sit and make their compositions. And of this opinion were all the barons, and judgment was given for the defendant.

In *Harris* vs. *Jays, Cro. Eliz.* 699, the case was that the queen's auditor and surveyor for the county of Northampton appointed a steward for one of the manors; and he kept the court and granted by copy lands which had escheated to the queen for felony. The question was whether the grant was good?

It was decided that the auditor and surveyor had no authority to appoint the steward, and that the grant by the steward was void. It was conceded that the law favors acts of one in reputed authority, and that acts of necessity done by an officer *de facto* are valid; but the grant in that case was held to be void, because it was a new grant in prejudice to the queen, merely voluntary, and which the steward was under no necessity to make. *Co. Litt.* 58, *b.*; 4 *Coke* 30; *Cro. James* 552, *O'Brian* vs. *Knivan*; 1 *Salkeld* 96.

The case of *The King* vs. *Lisle, Andrews* 163, and 2 *Strange* 1090, was an information in the nature of a *quo warranto*, brought against Lisle for acting as a burgess of Christ Church, in the county of Southampton. There were two questions in the case: 1st. Whether one Goldwire, who presided at the election of the defendant, was a mayor *de facto*: and 2d. If he was, whether the presiding of a mayor *de facto* was sufficient to make a title in the defendant against the crown.

As to the first point, it was found that Goldwire was never elected mayor, nor had any right or title to the office—but

under pretence and colour of being elected, he was sworn, <span style="float:right">A. Tucker<br>*vs.*<br>N. Aiken et als.</span> and acted as mayor all the year.

All the judges were of opinion that Goldwire must be taken to have been a mere usurper, and that to constitute a man an officer *de facto* there must be at least the form of an election, although that, upon legal objections, may afterwards fall to the ground.

It is settled that where there is an officer *de facto* a court will not grant a *mandamus* to compel a new choice, until such officer has been made a party to the proceeding, nor then unless in a very clear case. If there be any doubt, his right is to be settled by a *quo warranto*. 1 *W. Bl.* 445, *The King* vs. *Banks ;* 3 *Burrows* 1452; 4 *Burrows* 2008, *Rex* vs. *Bambridge ;* 2 *D. & E.* 259, *The King* vs. *Colechester ;* 1 *East* 79, *The King* vs. *Bedford.*

Where a statute made provision for the appointment of justices of the peace in a certain place, and declared that no person should be authorized to act as a justice unless he should have taken certain oaths—it was held, that the acts of a justice appointed under the statute, but who had not taken the oaths, were not void ; that it was unlawful for him to act without taking the oaths, and he might be punished by indictment for so acting, but his acts were valid. 3 *B. & A.* 266, *Margate Pier* vs. *Hannan.*

In the case of *The People* vs. *Collins,* 7 *Johnson* 549, an alternative *mandamus* had issued to the defendant, the town clerk of Turin, to record a highway laid out and established by the commissioners of highways in the town, or show cause why he had not recorded it ; and the clerk had returned, that the commissioners were duly elected, but because they had not been sworn into office, and a certificate of their oath filed in the clerk's office, according to law, he had not recorded the said highway. Upon a motion for a peremptory *mandamus*, the court said, if the commissioners acted without taking the oath they were liable to a penalty, and

that the town might proceed to a new choice; but the acts of the commissioners as such were valid as far as the rights of third persons and of the public were concerned. They were commissioners *de facto*, since they came into office by colour of title—and the motion was granted.

Where a deputy sheriff, who had not taken the oaths required by law, made an extent of an execution upon real estate, the extent was held to be valid. The court said that the deputy, having colour of title to the office by being duly commissioned, his acts were valid with respect to the rights of third persons who might be interested in those acts; and that the adoption of such a rule was necessary to prevent a failure of justice and great public mischief. 15 *Mass. R.* 180, *Bucknam* vs. *Ruggles; Hawkins P. C. b.* 1, *ch.* 8, *sec.* 3; 3 *Cruisis' Digest,* " *Officers,*" *sec.* 71—75.

Where a coroner, who had not given bond for the faithful execution of his office, made a levy of an execution upon a pew in a meeting-house, the levy was held to be valid. 15 *Mass. R.* 170, *Nason* vs. *Dillingham.*

In the case of *Fowler* vs. *Bebee and another,* 9 *Mass. R.* 231, the original writ was served on the 17th August, 1812, by one R. Day, as a deputy of J. Smith, sheriff of the county of Hampden. The defendants pleaded in abatement of the writ, that the statute for erecting the county of Hampden provided that the said act should not take effect and be in force until the 1st August, 1811; that on the 23d May, 1811, J. Smith was appointed sheriff of the said county, there being then no such county and no such office as sheriff of the county of Hampden, and that the said Smith being so appointed, on the 14th August, 1811, assumed to appoint the said Day as his deputy. To this plea there was a demurrer.

The court were of opinion, that Smith was sheriff *de facto*, and that, as he was no party to the record, and could not be legally heard in the discussion, it would be contrary to natural equity and the policy of the law, to settle the

question in that case whether he was sheriff *de jure*, and <span style="float:right">A. Tucker<br>*vs.*<br>N. Aiken et als.</span> they held the plea bad without considering whether he was sheriff *de jure* or not.

This court adopted the same principle in *Morse* vs. *Calley*, 5 *N. H. R.* 222, and in *Moore* vs. *Graves*, 3 *N. H. R.* 408.

When a suit is brought against any person for acts which he can justify only as an officer, and he attempts so to justify them, he must show himself an officer *de jure;* and the legality of his appointment being thus drawn in question in a suit to which he is a party, may be regularly decided. 9 *Mass. R.* 235; 3 *N. H. R.* 513, *Bishop* vs. *Cone.*

But in such cases many presumptions are made in favor of the legality of the title to the office, where the officer appears to have acted under the appointment. Thus in *Bishop* vs. *Cone* it was held that the record of an appointment of selectmen at a town meeting, and proof that they had acted under the appointment was evidence, nothing appearing to the contrary, that the town meeting was legally holden and that the selectmen were sworn.

But where it appeared that a collector of taxes, who had made a distress, was not sworn, the distress was held not to be legal. 2 *N. H. R.* 202.

The title to an office may be drawn in question directly by an information in the nature of a *quo warranto*, in which the officer is called upon to show by what warrant he claims to have, use, exercise and enjoy the office. 4 *Cowen* 100, *note*. The defendant in such a case must show a complete title. If he is found not to have been regularly appointed, his title fails. 10 *Mass. R.* 290, *Commonw.* vs. *Fowler;* 4 *Burrows* 2143, *Rex* vs. *Leigh.* So if regularly appointed but not sworn. 2 *Mod. Cases* 234; 1 *Strange* 582, *The Mayor of Penryn's case;* 9 *East* 252, *note, Rex* vs. *Ellis.*

Having thus shown who is to be considered as an officer *de facto*, and who a mere usurper, and how and when the authority of an officer *de facto* can be called in question, I

shall now proceed to consider how the principles which have been thus found to be settled and established on this subject apply in the case now before us.

Stowell was chosen collector at a meeting of the town regularly holden in every respect except that the moderator was not sworn ; and the only objection to the regularity of the choice in any other respect is, that previous to the choice the office had been struck off to him as the lowest bidder. It is then very clear that he came into office under colour of an election, so as to constitute him a collector *de facto.* An officer *de facto* is one who under colour of an election or appointment has the reputation of being the officer he assumes to be, but is not a good officer in point of law. Stowell may not have been a good collector in point of law, but he certainly had colour of election enough to make him collector *de facto.*

Can the irregularities in the choice just mentioned be considered as rendering the election void, so that the defendants, by committing the taxes to him to collect, may be considered as wrong doers in this case ?

The statute simply provides that moderators of town meetings shall be sworn. Nothing is said of the effect of their not being sworn upon the proceedings of the meetings —nor are any penalties imposed if they act without taking the oath. Whether the doings of towns can in any case be held void on that account, and if in any, in what cases, may be question of no little difficulty.

It is, without doubt, highly improper to set up town offices at auction, and choose those who will serve for the most moderate compensation. The sale of public offices is illegal. It has often been so decided. 2 *N. H. R.* 517 ; 5 *ditto* 196.

Setting up an office at auction in the manner the town of Derry did in this instance, has all the mischief of a sale. It has a tendency to divert the attention of the electors from the qualifications of the candidate to the terms on which

they will consent to serve, and makes the choice turn upon considerations which ought not to have an influence. And if it shall be decided that the office of collector may be thus filled, it will be difficult to find any sound reason why the offices of town clerk, selectmen, and representatives in the general court may not be filled in the same manner.

A collector thus chosen is not fit to be trusted with the power to seize the goods and arrest the bodies of citizens, especially of citizens who do not concur in the choice. And if an action of trespass had been brought against Stowell for taking the goods mentioned in this declaration, he would probably have found it very difficult to show a legal defence. In such a case the legality of his election might have been examined and settled.

But he is not a party to this suit, and his legal title to the office cannot be settled. He was in the office of collector under colour of title. The defendants had no right to assume to determine the validity of his title. They were not the judges of the questions, whether the meeting of the town was illegal because the moderator was not sworn, or the choice of the collector invalid because the office had been struck off to him at auction. These were questions on which Stowell had a right to be heard in a court of justice, before they should be settled; and they are questions which ought not to be settled in this case, where he cannot be legally heard.

I am therefore of opinion that these defendants cannot be held liable in this case on account of any irregularity in the election of Stowell, and that in committing the taxes to him to collect they did no more than it was their duty to do.

Green and Upham, Justices, concurring in the foregoing opinions, the verdict was set aside, and a

*New trial granted.*